FILED
FEB - 6 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WHITAKER CONTRACTORS, INC. )
Plaintiff, )
vs. )
THE UNITED STATES, )
Defendant. )

No. 06-95 C

## COMPLAINT

Allegations Common to All Claims

1. This court has jurisdiction pursuant to the Contract Disputes Act, 41 U.S.C. Section 601, et seq. and 28 U.S.C. Section 1491(a)(2).

2. Plaintiff Whitaker Contractors, Inc. ("Whitaker") is an California Corporation.

3. The United States, by and through the Sacramento District, Corps of Engineers, entered into a contract with Whitaker Contractors, Inc. entitled Contract 2 - Lake Kahweah Spillway Enlargement, Terminus Dam, CA. DACW05-02-C-0014.

4. Whitaker entered into a subcontract with Jensen Drilling, Inc. "Jensen" in which a portion of the work on the contract described in the above paragraph was subcontracted to Jensen.

5. During the course of performance of the contract, claims arose on the work performed by Jensen.

6. On August 9, 2005, the Corps issued its final contracting officer's decision on these claims. This final decision is attached hereto as Exhibit 1. This complaint claims for the entitlement and quantum denied by the contracting officer's decision.

First Claim: Rockbolt Vertical Distance

7. The contract required that on benches that were to be excavated, that there would not be more than 8' of unsupported height.

8. The Corps interpreted this to mean that the vertical height of the benches could be no more than 8' below a row of rockbolts that were being drilled into the vertical faces of the benches.

9. Jensen interpreted the contract to mean that in 8' of unsupported height should include the 2.5' radius of influence that the rockbolts had on the vertical face of the benches. When that 2.5' radius of influence was taken into account the vertical portion of the bench should have been up to 10.5' rather than 8'.

10. The Corps did not agree with Jensen's interpretation of the term unsupported height as stated in 9 above and it limited Whitaker and Jensen to a maximum excavation of 8' below the lowest rock bolt, thus the Corps only allowed one row of rock bolts to be installed per vertical bench, in lieu of the two rows per vertical bench that Jensen Drilling had planned to place.

11. Jensen incurred $58,055.68 in additional cost by complying with the Corps' interpretation of the contract.

12. The Corps direction to restrict the vertical distance between the rock bolts to 8' on the vertical slopes was in excess of what the contract required and caused Whitaker and Jensen to incur an additional $58,055.68 in cost.

Second Claim: Excessive Grout Testing

13. The contract required grout to be injected around the rockbolts after the rockbolts were

installed.

14. The contract required the grout to be tested during trial batches at the beginning on bolt installation, but the contract did not require each batch of grout to be tested during installation of rock bolts.

15. The Corps required Whitaker and Jensen to test the grout daily during the injection process.

16. Jensen incurred an additional $30,288.97 in grout testing cost, over and above what the contract required because of the Corps direction to test the grout daily during the injection operation.

17. The Corps direction to test the grout on a daily basis was in excess of what the contract required and caused Whitaker and Jensen to incur and additional $30,288.97 in cost.

Wherefore, plaintiff demands judgment in the amount of $58,055.68 on its first claim and in the amount of $30,288.97 on its second claim and for interest pursuant to the CDA and for attorney fees pursuant to the Equal Access to Justice Act.

DATED this 3 day of February, 2006.

Joseph A. Yazbeck, Jr.
YAZBECK, CLORAN & HANSON, LLC
1300 SW 5th Ave., Suite 2750
Portland, Oregon 97201
Tel: 503-227-1428
Fax: 503-227-4866

OCT-07-2005 09:53 JENSEN DRILLING 541 726 6140 P.03

CERTIFIED MAIL — RETURN RECEIPT REQUESTED

DEPARTMENT OF THE ARMY
U.S. ARMY ENGINEER DISTRICT, SACRAMENTO
CORPS OF ENGINEERS
1325 J STREET
SACRAMENTO, CALIFORNIA 95814-2922

August 9, 2005

AUG 23 REC'D

Office of Counsel

SUBJECT: Claim for Equitable Adjustment under Contract DACW05-02-C-0014, Contract 2 – Lake Kaweah Spillway Enlargement, Terminus Dam, California

Mr. Matt Bousman
Whitaker Contractor, Inc.
22985 El Camino Real
Santa Margarita, California 93453

Gentlemen:

Pursuant to Paragraph FAR 52.233-1, "DISPUTES," of the contract clauses, this letter, with enclosures, constitutes the Contracting Officer's final decision on your claims for additional work reducing 10' lifts to 5' and additional grout testing, under Contract No. DACW05-02-C-0014, Construction of Contract 2 – Lake Kaweah Spillway Enlargement, located at Terminus Dam, California. The total equitable adjustment demanded by your firm under these claims is an additional $99,552.22.

After a review of the contract requirements, correspondence and all matters pertinent to your claim, in accordance with the "Contracting Officer's Final Decision," enclosed herewith, it is my final decision that your claim is without merit and is hereby denied.

Ronald A. Schunk
Contracting Officer

CONTRACTING OFFICER'S FINAL DECISION

The Prime Contractor, Whitaker Contractors, Inc. (Contractor), submits two claims on behalf of their rock anchor subcontractor, Jensen Drilling (Jensen) related to its contract for a dam spillway enlargement. The first claim is based on the requirement by the US Army Corps of Engineers District, Sacramento (Government) for 8' of unsupported height for the excavation benches. The Contractor's claim alleges that the contract specifications requiring the 8' of unsupported height for excavation benches is vague and that 10' excavation benches would be more cost efficient. Secondly, the Contractor claims for costs of daily testing of the grout mix used for securing the rock anchors and anchor bearing pads. The Contractor alleges that the specifications do not require daily grout testing and that testing is not normally required once production begins. The Government contends that the contract was specific as to the requirement for excavation of a maximum 8' unsupported vertical height, and that grout testing was a condition for approval of Jensen's submittal for an alternate design grouted rock anchor.

FINDINGS OF FACT

1. Contract No. DACW05-02-C-0014, dated August 1, 2002, in the firm fixed lump sum price of $8,632,157.00 was entered into by the U.S. Army Corps of Engineers District, Sacramento, (herein the Government) and Whitaker Contractors, Inc. (herein the Contractor) for the construction of Contract 2 – Lake Kaweah Spillway Enlargement, located at Terminus Dam, California. The contract documents included: Contract documents include Standard Form 1442, Pricing Schedule (pages 5 of 176 through 8 of 176), Construction Clauses (Section 00700 starting page 31 of 176), Special Contract Requirements (Section 00800 starting page 155 of 176), Attachments, Technical Specification 1212, and Drawing File KT2-09-324 (drawings 1 through 109).

2. The Contractor acknowledged the Notice-To-Proceed on August 12, 2002. The current contract price, including modifications through R00025, is $9,161,018.27. The project was accepted as complete on February 11, 2004.

3. The contract's "Scope of Work" is set forth on Standard Form 1442 in the Description Section as:

> "Project involves rock excavation and construction of reinforced concrete water intake structure conduit, wetwell, and six 21 foot tall fusegates at the spillway of Terminus Dan (Lake Kaweah), CA."

4. Two separate claims have been filed against this contract, both on behalf of the rock anchor subcontractor, Jensen Drilling (Jensen). The first claim involves the unsupported height of the excavation benches. The second claim concerns testing requirements for the grout used on the rock anchors and anchor bearing pads. The claims together total less than $100,000. These claims will be addressed separately in this Decision.



EXHIBIT 1
PAGE 2 OF 15

RELEVANT CONTRACT CLAUSES

5. The following Contract Clauses of Section 00700 are particularly relevant to these matters:

FAR 52.233-1 (pages 108 and 109 of 176), DISPUTES;

FAR 52.236-21 (pages 117, 118, and 119 of 176), SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION.

CLAIM FOR UNSUPPORTED HEIGHT OF EXCAVATION BENCHES

RELEVANT TECHNICAL SPECIFICATIONS

6. The following Sections of Technical Specification 1212 are relevant to this claim:

Section 02310, SPILLWAY AND ABUTMENT EXCAVATION

PART 1 GENERAL

1.1 GENERAL

> This Section describes the surface excavation and grading to be performed to widen and shape the existing spillway channel. Excavation of the existing spillway to its current configuration required removal of the rock by both mechanical equipment and a significant amount of blasting. The Contractor shall complete all blasting prior to the placement of any concrete structures. Excavated slopes shall be stabilized as specified in SECTION 02490 ROCK ANCHORS and as shown on contract drawings.

PART 3 EXECUTION

3.1 EXCAVATION

3.1.1 General

> The approval of any excavation plan is a conditional approval of procedures based upon performance. Acceptance of a procedure does not relieve the Contractor of producing the design slopes in a safe manner . . .
>
> Excavated slopes shall be supported as shown on contract drawings. **Excavation and stabilization of rock slopes shall proceed in a top-down sequence with a maximum unsupported height of 8 vertical feet prior to installation and lock off of rock anchors as specified in SECTION 02490 ROCK ANCHORS.** [Bolded in original text.]

Section 02490, ROCK ANCHORS

PART 1 GENERAL

1.4 SYSTEM DESCRIPTION

1.4.2 Alternate Design

> Alternate designs may be considered, provided that the following performance criteria are met:
>
> b) Type II Cut Slope Anchors - . . Maximum allowable unsupported excavation height is eight (8) feet.

PART 3 EXECUTION

3.3 CONSTRUCTION SEQUENCE – TYPE II (CUT SLOPE) ANCHORS

> Excavate slope to 1:5 or 1:2 (H to V) inclination as indicated on Drawings and in accordance with Section 02310 of the Project Specifications. Excavation shall be supported in a top-down sequence with a maximum unsupported height of 8 vertical feet prior to installation and lock off of rock anchors.

7. On 23 October 2002 the Contractor submitted a letter, H-0014, to the Resident Engineer requesting a modification of the specified 8' intermediate excavation height to 10', thus allowing two rows of anchors to be placed for each bench. The letter stated that the Contractor and its rock anchor subcontractor, Jensen Drilling (Jensen), believe that the additional 2' would not affect slope stability. In addition, on 30 October 2002 the Contractor submitted letter H-0017 referencing letter H-0014 and a conference call that it had with the Government in which it had requested that the Government allow 10' excavation in lieu of the 8'. A sketch showing its interpretation of what an 8' bench would be like and how a 10' bench would look was included in letter H-0017. The sketch indicates an 8' bench would have a 12 ½' unsupported height while a 10' bench would have a 10' unsupported height.[1]

8. A letter from Jensen to the Contractor, dated 22 November 2002, offered further justification for 10' rather than 8' of unsupported excavation. Jensen's letter indicates that the Government's position neglects the influence of the bolts and further argues that the fact that the Contractor placed a berm against the slope to facilitate access also helped to stabilize the slope as excavation advances. The subcontractor's letter states that if the determination remains that 8' lifts are the limit, they will have to request additional costs for loss of production.

9. John Humbert, the Government's Quality Assurance Representative (QA Rep), in the Inspectors Quality Assurance Report (QAR) for 11 December 2002, states in the **Controversial**

[1] NOTE: The unsupported height is measured from the last anchor row installed, not from a theoretical influence line below the anchor.



EXHIBIT 1
PAGE 4 OF 15

**Matters in Detail** section that the Contractor had announced that Jensen was going to file a claim "in regard to 8' max. height for unsupported excavated slopes (spec. section 02310, paragraph 3.1.1)". The QAR further reads,

> ***It is the contractor's contention that the requirement is not clearly stated, and the zone of influence of the rockbolts should not be included in the 8'. This would, they say allow 10' slopes . . . .

← ? Last sentence ?

10. Letter H-0040 from the Contractor to the
discusses various outstanding issues. Items 2 an est
to revise the excavation depth to 10' and notes t d
with this request. The letter states the Contracto nd
may warrant the Government paying for the addi e
Contractor. The Contractor followed up this let hich
requests permission to modify the pre-split blasti
Contractor be allowed to drill 14' deep; howeve 5'
for purposes of installing rock anchors.

11. In response to letters H-0040 and H-004
Administrative Contracting Officer (ACO), sent on
07 January 2003 and 10 January 2003, respectiv
requested deviation from an 8' excavation depth
Government's reasoning behind the denial.

12. The Contractor sent letter H-0049 to the Resident Engineer on 16 January 2003 that requests a change to the project schedule in order to more accurately represent the actual construction. The letter states that the Contractor's original schedule was based on 8' excavation benches but the government is only allowing a 5' excavation bench, as with an unsupported height of 8' measured from the bolt, the average excavation is only 5'. The Contractor's letter alleges that this will require several additional excavation benches not shown on the original schedule.

13. By letter H-0056, dated 27 January 2003, the Contractor forwards a report to the Resident Engineer from a consultant, Cornforth Engineering (Cornforth), hired by their subcontractor, Jensen, to evaluate 10' excavation feasibility. Based on Cornforth's report, the Contractor again asks for permission to excavate 10' in lieu of the 8' specified. However, an e-mail message from Matt Bousman, Contractor Project Manager, to the QA Rep incorporated into the QAR for 11 February 2003, indicates that the Contractor has not yet received a response to the report from Cornforth and that "Jensen Drilling is approaching a break point at which they will pursue a claim."

14. The QAR for 13 February 2003 incorporates an e-mail message from Michael Ruthford, Government Design Engineer, to the ACO, which in turn forwards a message from Pamela Cory of URS Consulting (URS), a consultant under contract to the Government. Ms. Cory's message responds to Cornforth's letter to Jensen regarding the excavation bench heights. URS's response indicates that Cornforth's evaluation and report "do not provide supporting analyses to demonstrate the safety" or substantiate a change to 10' high unsupported bench excavations but

instead represent a review of one of URS's rock anchor design basis documents "Terminus Dam Spillway Fuse Gate Foundation and Rock Anchor Evaluation". URS states that Cornforth apparently made no site visits and no computations or new data were provided. Ms. Cory contends that, because the Cornforth reviewer was not provided with all supporting documents, data and rock mass analyses used to develop URS's recommendations, "incorrect conclusions were drawn [by Cornforth] regarding the dimensions of critical rock wedges". Ms. Cory's e-mail further states:

> ***An increased unsupported cut slope height of 10 feet significantly increases the face area of unsupported rock, and increases the hazard of daylighting basal failure planes of unsupported rock wedges . . ..
>
> In conclusion, insufficient new information or analyses have been presented to allow us to evaluate the safety of the proposed 10-foot unsupported cut height.

15. On 31 December 2003 Jensen submitted a letter to the Contractor that certifies two claims in the following amounts:

1. Additional work reducing 10' excavation lifts to 5'excavation lifts – $58,005.68
2. Additional grout testing – $30,288.97

16. By letter dated August 5, 2005, Whitaker submitted the claims on behalf of Jensen and added overhead and profit markups at 10% and 2.5% respectively, bringing the total amount claimed to $99,552.22.

## DISCUSSION

17. The Contractor, on behalf of its rock anchor subcontractor Jensen, claims entitlement to an equitable adjustment, asserting that excavation of the specified 8' benches was more costly than excavating 10' benches as it originally anticipated. Part 3.1.1 of Section 02310 of Technical Specification 1212, very clearly states, "excavation and stabilization of rock slopes . . . in a top-down sequence with a maximum unsupported height of 8 vertical feet prior to installation and lock off of rock anchors." In spite of this wording, the Contractor's October 30, 2002 letter (H-0017) indicates that it believed that the unsupported height was to be measured downward from the location of the lowest anchors previously installed. According to Jensen, this interpretation led to excavating only 5' of material before setting the next row of anchors with an unsupported height of 10'.

18. The 8' unsupported height, as specified in the contract, was the result of site work done by the Government's consultant, URS. In their February 13, 2003 e-mail, URS presents a reasoned defense in support of that decision stating, "An increased unsupported cut slope height of 10 feet significantly increases the face area of unsupported rock, and increases the hazard of daylighting basal failure planes of unsupported rock wedges . . .."

19. The Contractor's position, as stated in its letter H-0014 of 23 October 2002, that the additional unsupported 2' would not affect slope stability, is partially based on a report submitted

by Jensen from its consultant, Cornforth. Cornforth's report, forwarded by letter H-0056, dated 27 January 2003, reflects evaluations and conclusions derived from the academic review of only one of the reports that URS prepared during its studies of the Kaweah Spillway. Cornforth was not provided with all of the supporting documentation used to develop URS's recommendations; neither did Cornforth visit the project site to view the actual conditions, Therefore the Cornforth report does not appear as persuasive as URS's conclusions. Furthermore, Cornforth's report to Jensen provided no new data or analyses to support Jensen's and the Contractor's contention. Thus, the Government is compelled to agree with URS's conclusions that an increased risk could exist with the excavation of the 10' benches and it is obliged to enforce the contract as written. Accordingly, the Contractor's claim is denied.

## CLAIM FOR TESTING REQUIREMENT FOR GROUT

### RELEVANT CONTRACT CLAUSES

20. The following Contract Clauses of Section 00700 are particularly relevant to these matters:

FAR 52.243-4 CHANGES (Pages 120 and 121 of 176)

FAR 52.243-7 NOTIFICATION OF CHANGES (Pages 121, 122 and 123 of 176)

FAR 52-246-12 INSPECTION OF CONSTRUCTION (Pages 126 and 126 of 176)

### RELEVANT TECHNICAL SPECIFICATIONS

21. The following Sections of Technical Specification 1212 have relevance to this claim:

Section 02490, ROCK ANCHORS

PART 1 GENERAL

1.4 SYSTEM DESCRIPTION

1.4.1 Summary

> The work specified in this section shall include all labor, materials, equipment, and incidentals to complete the installations of corrosion-protected fully grouted rock anchors. Two types of rock anchors are specified: Type I Fusegate and overflow sections foundation pretensioned anchors with design capacity of ~~180~~150 kips; Type II abutment cut slope pretensioned anchors with design capacity of ~~100~~65 kips. In addition, erosion apron slab untensioned rock dowels with a design capacity of 20 kips are specified. Pretensioned Type I and II anchor shall be provided with a mechanical expansion shell capable of holding the design load. . .



EXHIBIT 1
PAGE 7 OF 15

1.4.2 Alternate Design

Alternate designs may be considered, provided that the following performance criteria are met . . .

All other rock anchoring devices including related hardware used only for the Contractor's convenience or to accommodate the Contractor's means and methods of construction shall be included in the base bid. No additional compensation for such items will be provided resulting from changes in planned methods or sequencing of work.

1.5 SUBMITTALS

Government approval is required for submittals with a "G" designation

SD-01 Preconstruction Submittals

Fabrication and Installation Drawings; G

Drawings and data shall be submitted for the rock anchors showing the chemical and physical properties of all materials to be used in the bolt assemblies being supplied, and the type and properties of cement grout, grout additives or grout materials. The submittals shall show evidence that all proposed materials have been successfully used in primary permanent reinforcing systems for a period of not less than 10 years.

SD-06 Test Reports

Cement Grout Mixture Proportions

Thirty days prior to installation of anchors, the Contractor shall submit the mixture proportions that will produce grout of the quality required. Applicable test reports shall be submitted to verify that the grout mixture proportions selected will produce grout of the quality specified.

SD-11, Closeout Submittals

Anchor Records

Upon completion of installation of each anchor, the Contractor shall furnish anchor length, free stressing length of anchor, grout mix, grouting pressure, bags of cement injected, and a report of performance test or proof test results. The performance test and proof test results shall include measured lengths of drill holes and anchors, the loads and elongations recorded during testing, monitoring and stressing of the anchors, and graphs of test results.

PART 2 PRODUCTS

2.3 GROUT

2.3.5 Grout for Anchors

2.3.5.1 Cement Grout

Cement grout mixture proportions shall be the responsibility of the Contractor. Grout for grouting anchors shall consist of a homogenous, pumpable, stable mixture of Portland cement and water. The Contractor shall submit his proposed mix design to the Contracting Officer for approval. The water content shall be the minimum necessary for proper placement but the water-cement ratio shall not exceed 0.45 by weight. Final proportions of materials shall be based on results of tests made on sample mixtures of grout. The minimum compressive strength of two-inch cubes, molded, cured, and tested in accordance with ASTM C 109/C 109M, shall be 3,000psi at the time of stressing. The grout shall be nonferrous, non shrink grout conforming to ASTM C 1107 The Contractor shall be responsible for taking, curing, and breaking of grout test cubes for determining mix design, and all testing shall be done by an independent laboratory approved by the Contracting Officer. Rock conditions and temperatures shall be replicated in the curing process.

2.5 TESTS, INSPECTIONS, AND VERIFICATIONS

The Contractor shall have required material tests performed on prestressing steel and accessories by an approved laboratory to demonstrate that the materials are in conformance with specifications. Grout shall be tested in accordance with ASTM 109/C 109M. These tests shall be at the Contractor's expense . . .. Grout test results shall be provided to the Contracting Officer within 24 hours of testing.

RELEVANT TRANSMITTALS

22. The following transmittals are especially relevant to the claim:

Transmittal 02490-1, dated 19 November 2002

Transmittal 02490-1.2, dated 18 December 2002

23. On 22 November 2002, the Government held a meeting with its consultant, URS, the Contractor and the Contractor's rock anchor subcontractor, Jensen, regarding the rock anchor grout. Placement of grout using Intraplast-N must be completed within 1 hour of batching, and specifications limit time between mixing and placement to 30 minutes. The Contractor will verify grout-testing requirements in ASTM C109 as specified and submit grout-testing plan. The Government agreed to allow the Contractor to proceed at its own risk until a determination is made whether the proposed grout is acceptable.

24. In an e-mail message incorporated into the QAR dated 5 December 2002, Norbert Suter, Government Project Manager, disagrees with the QA Rep for allowing the contractor to proceed at his own risk on the production anchors. Mr. Suter states that the Contractor's mix design indicates 24-hour strength of 2,510 psi and the Government is getting only 600 psi "so something is seriously flawed." Mr. Sutter goes on to say that although he agrees that there is a need to get the "contract moving, the contractor first needs to figure out what is wrong with his mix before proceeding on the production anchors." Mr. Suter is emphatic in stating, ". . .the grout is the single most important component."

25. The QAR dated 11 December 2002 incorporates an e-mail message from the QA Rep to Robert Ramsey, Government Design Engineer, which documents a conference call that included representatives from the Government, URS, the Contractor and Jensen. The primary topic, as described in the e-mail, was centered on Jensen's proposed new alternate design and grout mix. The e-mail states that the "Contractor will evaluate new mix designs to assure they meet specifications (both requirements and restrictions)" then forward the information to the Government as supplemental to the rock anchor submittal.

26. On 18 December 2002 the Contractor submitted letter H-0033 to the Resident Engineer that chronicles that six Type II Pre-Production Rock Anchors were successfully tested and completed and that the grout chosen to anchor and backfill the anchors is working and achieving the required 3,000 psi within 24 hours of batching. In the QAR for that date, the QA Rep states that Grady Bell, the Contractor's Quality Control Representative (QC), had shown the QA Rep a "copy of the latest part of the rockbolt submittal concerning the grout. It indicates that after preproduction testing there will be no grout testing unless there are failures during production testing." The QA Rep told the QC that the Government would not agree with that and indicated that he believed that the Control Manual would say a minimum of one test per day.

27. Jensen submitted a letter to the Contractor on 19 December 2002 concerning grout cube testing. The Contractor forwarded Jensen's letter to the Government by letter H-0035 of 20 December 2002. In its letter Jensen contends that the PTI (Post-Tensioning Institute) indicates, "Grout cube testing is not normally required . . ." and that the contract specifications do not call for grout cube testing during installation of production anchors. Jensen states their belief that they are not obligated to routinely sample and test grout batches. The Contractor's forwarding letter requests a modification be issued if the government wished additional grout sampling on a daily basis.

28. The ACO's letter of 26 December 2002 responds by reminding the Contractor of the following review comments stated on Transmittal No. 02490-1.2, Anchor Resubmittal, dated 17 December 2002:

> 6. Revised Anchor Grout Mix and Testing Program ...Because of the importance of grout strength in the revised design, and poor performance of the originally proposed grout mix incorporating IntraplastN, you are required to continue grout testing at a frequency as indicated in the Construction Control Manual.



EXHIBIT 1
PAGE 16 OF 15

29. On 06 January 2003, Jensen sent a letter to the Contractor responding to the ACO's letter of December 26, 2002 and to the review comments regarding their Anchor Resubmittal. Jensen's letter reiterates that the PTI states that grout cube testing is not required after initial testing is completed and that they feel, in light of PTI's recommendations, that routine testing of anchor grout is not required or needed. The Contractor's letter H-0046, dated 09 January 2003, forwards Jensen's 6 January letter and states that the specifications do not call for grout testing for either the mechanical anchor or the alternate design and asks, "Is the Construction Control Manual applicable, and if so, what section refers to grout testing?"

30. Jensen letter of 12 February 2003 to the Contractor, and Contractor's subsequent letter H-0069 of the same date to the ACO submits Jensen's $32,293.27 cost proposal for grout testing and requests a modification to the contract. The Contractor's letter adds 21.1% for Contractor's costs (16% for overhead and 5.1% for profit) to the proposal for a total requested amount of $39,333.20.

31. On 18 February 2003 the ACO responded to the Contractor's letter H-0069 with his letter C-0017. The ACO referred the Contractor to Item No. 2 of review comments on Transmittals 02490-1 and 02490-1.2, dated 19 November 2002 and 18 December 2002, respectively. The comments state, "The grout is tested once per day unless specifically approved otherwise." The request for additional compensation for grout sampling was denied.

32. The QA Rep notes in the **Verbal instructions given to Contractor** section of the QAR for 13 February 2003 that the "last batch of grout" was mixed with more water than usual and that any changes in the grout testing would not be allowed without compressive strength results in hand. The QA Rep also notes that Jensen had requested a meeting with Ray Rice from URS, and states that both he and Mr. Rice agreed that it would be improper for Jensen to be dealing with the Government's consultant.

33. In the **Controversial Matters in Detail** section of the 14 February 2003 QAR the QA Rep states that he worried that Jensen might take it into his head to "alter the mix for the grout type #2 bolts being grouted today" and that he had learned the following Monday that this had happened, and that Jensen had used a different lab than the one submitted and approved. The Contractor's Quality Control Report (QCR) of that date also indicates in the **Activities in Progress** section that Kleinfelder (approved lab) and Technicon (unapproved lab) had both arrived on site to take grout samples and that Jensen had asked Kleinfelder to leave and said that it wasn't necessary for Kleinfelder to sample stating, "he didn't want any more inconsistencies."

34. In an e-mail message incorporated into the 18 February 2003 QAR, the QA Rep indicates to Robert Ramsey (USACE) that Jensen previously had increased the percentage of water in the grout mix for the first two type I anchors and again with the type II anchors. The QA Rep also indicates that Jensen had sent the Kleinfelder lab technician off-site without a grout sample and had two samples taken by "Technicon out of Visalia". The Contractor was notified and apparently had "ripped him [Jensen] pretty good." The QA Rep states that the Contractor confused the 3,000psi requirement for grout with the mix design and that the QA Rep had to remind the Contractor that the 3,000psi only relates to stressing of bolts. In contrast, changes in the percentage of water in the mix impacts the ultimate strength of the grout. He stressed, "That

is why the approved % of water in the approved mix design CANNOT be exceeded." [Emphasis contained in message.]

35. The QA Rep incorporated his 19 February 2003 e-mail message to the ACO into the daily QAR. His message indicates that, at a November Meeting in regard to rock bolts, Jensen had been told that as per the "Control Manual", the Government "would require a minimum of one grout test for each day" and that Jensen indicated that they did not want to do that. The QA Rep states that there wasn't "any great general discussion at that time" as other matters were being resolved, but that Jensen knew at that time what would be required. The QA Rep also states that when he last spoke to the Contractor he was told that the Contractor "would get the testing required, and that the matter of who pays for them is between Whitaker and Jensen." In the **Verbal Instructions Given to Contractor** section of the QAR, the QA Rep notes that, in his cover letter for a submittal he is sending for grout mix designs, he asked Contractor to address the problems with Jensen.

36. The Contractor's letter H-0075, dated 20 February 2003, chronicles recent actions by Jensen in that the grout mix was modified and Jensen utilized an unauthorized testing lab without prior permission. The Contractor states they have informed their Contractor's Quality Control Representative to stop work if this happens again. The ACO's letter C-0019 of 26 February 2003 responds to the Contractor's letter H-0075. The ACO warns the Contractor that the fact that Jensen unilaterally changed the grout mix design, possibly indicates a lack of quality control supervision on the Contractor's part and that it would be reflected on the Contractor's performance evaluations.

37. On 03 March 2003, the Contractor submitted letter H-0081, which encloses a letter from its supplier, Master Builders, Inc., indicating that increasing the water in the grout mixture will affect the mixture in the same way as increasing the water/cement ratio in a cementitious mixture in that it would take the mixture longer to reach strength. The Contractor indicates that the few hours' delay in reaching the 3,000-psi is acceptable to them and requests that the Government approve the revised grout mix. Later in the month, on 21 March 2003 the quality assurance lab, Consolidated Testing Laboratories, sent a letter to Valley Resident Office transmitting test results on grout cubes made on 19 March 2003. The 24-Hour strength of 3,310 psi met the contract requirements.

DISCUSSION

38. The Government does not dispute the following aspects of this claim. Pursuant to Paragraph 1.4.2 of Section 02490 of Technical Specification 1212, the Government agreed to consider alternate designs to the Rock Anchor System Design described in Paragraph 1.4.1 of the Specification as long as the specified performance criteria was met. Transmittals No. 02490-1 and 02490-2 submitted by the rock anchor subcontractor, Jensen, in November and December met the specified criteria and both were subsequently approved by the Government but were conditioned by a requirement of daily testing of the grout mix. Jensen proceeded with the alternate design as approved.

39. Although the grout mix, with admixture (plasticizer) Intraplast-N, submitted under Transmittal No. 02490-1, was approved for use, there was a real concern that the required 3,000 psi was not being obtained at the time of stressing, within 24 hours of placement as designed by Jensen. At a meeting of all interested parties held 22 November 2002, Jensen stated that as an alternative to the failing grout mix, rather than purchasing a different grout from a commercial batch plant, it intended to mix the grout on-site. Jensen planned to perform this mixing without the batching controls present at commercial plants. At the meeting, both the Contractor's representative and members from Jensen's organization were told that as a condition of approval for the on-site batch mixing, the Government would require daily testing of the mix. Subsequently the Contractor's Transmittal 02490-2 was approved in December 2002 with the review comment: "The grout is tested once per day unless specifically approved otherwise." This comment is considered by the Government to be a condition of approval of the alternate system and as such became an integral part of the Transmittal.

40. Since the Contractor's first proposed mix failed the psi requirement, as noted in Norbert Sutter's 5 December 2002 e-mail message, and since field mixed grout will vary from batch to batch, the Government believed the only practicable way of ensuring that strength requirements were being met for each individual batch was to test the grout on a daily basis. In addition, as the mechanical tensioning mechanism, specified in the Rock Anchor System Design described in Section 02490, Paragraph 1.4.1 of Technical Specification 1212 was eliminated as superfluous in Jensen's alternate design, the Contractor had to be able to ascertain the strength of the grout pad before tensioning the anchor; thus daily testing of the grout mix became necessary in the Government's mind as the simplest method for quality control verification.

41. A serious issue that arose during performance of the contract that made mandatory daily testing of each mix batch even more justifiable was that Jensen unilaterally modified the grout without approval and sought the services of an unapproved laboratory for testing. The Government's QA Rep documented this action in the QAR dated 14 February 2003. FAR 52.246-12, INSPECTION OF CONSTRUCTION, requires that:

> *** (b)The Contractor shall maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements. ***

While the altered mixture performed satisfactorily, these actions on Jensen's part indicated the subcontractor's lack of adherence with both the quality control and the submittal requirements of the contract and the Contractor's lack of quality control supervision. Reacting to Jensen's actions the Contractor told the Government's ACO that the daily testing would be performed and that the organization bearing the cost would be settled between the prime and subcontractor. The Contractor's statement was documented in an e-mail message to the ACO incorporated by the QA Rep into his 19 February 2003 QAR.

42. It is true that the Government's requirement for daily testing was not part of the original contract specifications and might be construed as a change to the contract. FAR 52.243-4 and FAR 52.243-7, the CHANGE Clauses of the Contract provide that



EXHIBIT 1
PAGE 13 OF 15

> "if . . . Government conduct effected a change as alleged by the Contractor, and the conduct causes an increase or decrease in the Contractor's cost of . . . performance of any part of the work under this contract . . . an equitable adjustment shall be made..."

Assuming arguendo that an increased cost could be found to derive from the Government's directive, an entitlement for an equitable adjustment to the Contractor still cannot be established as the Contractor was notified prior to onset of construction that the alternate design would be approved only on the condition "that [the] grout is tested once per day." At that point in time, the Contractor and his subcontractor had the option of constructing the Rock Anchor System as specified in the contract or in proceeding with the alternate design as conditioned. It is assumable that since the Contractor proceeded with the proposed alternate design, even as conditioned, that it perceived the alternate design to be the more cost effective method of completing the contract requirements. To claim for increased costs after the work has been completed, and three years after making the decision to go forward with the conditioned alternate design, is unfair to the Government who approved the alternate design in good faith.

43. A contract for construction of a Rock Anchor System came into being when the contract was awarded. After award, changes in the design took place as were suggested by the Contractor and approved by the Government to simplify erection. The contractor was to build the rock anchor system described in its alternate bid, as further detailed and approved by the Government in Review Comments on Transmittal 02490-2. No cost considerations were discussed in the proposal of the alternate design and Paragraph 1.4.2 of Section 02490 of Technical Specification 1212 of the contract, states that with respect to materials and methods proposed as an alternate by the bidder, no additional compensation for such items will be provided. It is established that an initial award and approval is not a fluid act to be withdrawn, adjusted or reasserted as later circumstances dictated. The decision to accept the alternate design as approved was final in all respects. If it were not, the original contract would be void for indefiniteness. The Contractor's claim is denied.

## FINAL DECISION

Pursuant to the facts and contractual principles set forth above, your claims in the total amount of $99,552.22 for additional costs due to reducing 10' excavation lifts to 5' excavation lifts and for additional grout testing are hereby denied. This is the final decision of the Contracting Officer.

## APPEAL PROCEDURE

This is the final decision of the Contracting Officer. You may appeal this decision to the Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the (Armed Services/Engineer) Board of Contract Appeals, (Skyline Six, 5109 Leesburg Pike, Falls Church, VA 22041-3208/20 Massachusetts Av., NW, Washington, DC 20314-1000), and provide a copy to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. Instead of appealing to the Board of Contract Appeals, you may bring an action directly in the U.S. Claims Court (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts)



EXHIBIT 1
PAGE 14 OF 15

within 12 months of the date you receive this decision. If you appeal to the Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $10,000 or less or its accelerated procedure for claims of $50,000 or less.

Ronald A. Schunk
Contracting Officer